**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 06-CR-40-LRR |
| vs. | **ORDER** |
| TRAVIS GROVER, | |
| Defendant. | |

_____

*TABLE OF CONTENTS*

*I.   INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.  PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*III. TRIAL EVIDENCE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

*IV.  STANDARD OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*

*V.   THE "NEWLY DISCOVERED EVIDENCE"* . . . . . . . . . . . . . . . . . . *8*

*VI.  ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*
    *A.   Parties' Arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*
    *B.   Legal Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*
        *1.   Material evidence discovered after trial through no fault of
            Defendant* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*
        *2.   Impeaching evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . *9*
        *3.   Not likely to produce an acquittal* . . . . . . . . . . . . . . . . . *10*

*VII. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *12*

## I. INTRODUCTION

The matter before the court is Defendant Travis Grover's Motion for New Trial ("Motion") (docket no. 82).

## II. PROCEDURAL HISTORY

On April 6, 2006, Defendant and his co-defendant, Shaun Williams, were charged in a one-count Indictment. The Indictment charged that, on or about October 13, 2004, Defendant and Williams knowingly and intentionally distributed and aided and abetted the distribution of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, to Stan Butterbaugh, resulting in the death of Butterbaugh from the use of the heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

On May 11, 2006, Williams entered a guilty plea to the charge in the Indictment. On the same day, Chief Magistrate Judge John A. Jarvey filed a Report and Recommendation which recommended acceptance of Williams's guilty plea. On May 26, 2006, the court accepted Magistrate Judge Jarvey's Report and Recommendation.

On May 30 and 31, 2006, Defendant was tried before a jury. Defendant was personally present and represented by his attorney, Christopher A. Clausen. Assistant United States Attorney Charles J. Williams represented the government. On June 1, 2006, the jury found Defendant guilty of distributing heroin or aiding and abetting the distribution of heroin as charged in the Indictment. The jury also answered, "No," to the following question:

> Do you unanimously find, beyond a reasonable doubt, that S.B. died as a result of using the heroin distributed to him by the defendant?

On November 7, 2006, Defendant filed the instant Motion, in which Defendant requests a new trial based on federal inmate Ronnie Leroy Snyder's statement to law

enforcement agents that a government witness, Jason Winters, recanted his testimony.[1] On November 9, 2006, the government filed its Resistance (docket no. 84) to Defendant's Motion.

### III. TRIAL EVIDENCE

The case against Defendant arose from the death of Butterbaugh on October 13, 2004. Butterbaugh died following his use of heroin sold to him by Defendant on two separate occasions during the afternoon of October 13, 2004.

Jeremy Carstens testified that he used heroin with Butterbaugh, Ryan Polanski and Defendant during 2003 and 2004. Carstens testified that Defendant secured the heroin for their use on two occasions prior to the day Butterbaugh died.

In 2004, Polly Greene was involved with and lived with Shane Peterson in Cedar Rapids, Iowa. Polly Greene's minor daughter, Nicole Greene, lived with them. Polly Greene came to know Butterbaugh through Peterson. Polly Greene, Peterson and Butterbaugh used heroin together about one time each week from approximately February of 2004 until Butterbaugh's death. Polly Greene testified that, on October 13, 2004, at about 10:00 a.m. or 11:00 a.m., Butterbaugh came over to Peterson's apartment located at 408½ B Avenue, Cedar Rapids. The three of them decided to purchase heroin to use together. Butterbaugh called Defendant in search of heroin. Defendant told Butterbaugh that he would be able to get heroin for them later in the afternoon. Around 3:00 p.m. or 4:00 p.m., Butterbaugh, Peterson, Polly Greene and Nicole Greene traveled to Defendant's

---

[1] On February 21, 2004, Ronnie Snyder was charged in a two-count Indictment in this court. *See United States v. Ronnie Leroy Snyder*, No. 04-CR-2008-LRR, 2006 U.S. Dist. LEXIS 57136, at *1-2 (N.D. Iowa Aug. 14, 2006). On July 7, 2006, Ronnie Snyder entered a guilty plea to Count 2 of the Indictment, which charged him with knowingly and intentionally manufacturing and attempting to manufacture a mixture or substance containing five grams or more of (actual) methamphetamine. On July 24, 2006, this court accepted Judge Jarvey's recommendation to accept Snyder's guilty plea. Snyder's sentencing is currently pending.

apartment, which was located near the Walgreens on First Avenue in Cedar Rapids, so that the adults could purchase heroin. When they arrived at Defendant's apartment, Butterbaugh gave Defendant approximately $100 in cash as payment for the heroin. Defendant made a few telephone calls and left the apartment. Defendant met someone in the parking lot of the apartment building and, within about five minutes, returned to his apartment with heroin. After returning to his apartment, Defendant gave heroin to Butterbaugh. Defendant kept some of the heroin for his own use. While in Defendant's apartment, Butterbaugh, Peterson, Polly Greene, Defendant and Defendant's girlfriend injected some of the heroin. About one and one-half hours after they arrived at Defendant's apartment, Butterbaugh, Peterson, Polly Greene and Nicole Greene left Defendant's apartment to return to Peterson's apartment.

Later that same day, Butterbaugh decided to purchase more heroin. Butterbaugh told Polly Greene that he had spoken to Defendant about obtaining additional heroin. Butterbaugh and Peterson borrowed the van that belonged to Polly Greene's mother for the purpose of driving to Defendant's apartment. Polly Greene and Nicole Greene stayed at Peterson's apartment.

Later that same day, Butterbaugh, Peterson and Defendant went to Williams's apartment, which was located on Center Point Road and 29th Street NE in Cedar Rapids, to purchase heroin. Williams testified that, at that time, he lived with Winters. According to Williams, beginning in July or August of 2004, Defendant and Williams supplied each other with heroin from time to time, depending on whose source could provide the heroin. Williams and Defendant used heroin together about two to three times per week during 2004. According to Williams, Defendant did not supply heroin to Winters. When Butterbaugh, Peterson and Defendant arrived at Williams's apartment on October 13, 2004, Williams was leaving to purchase heroin from his source, "Black." Butterbaugh, Peterson and Defendant asked Williams if he could get heroin from Black for them. Williams

4

explained that he had already called his source, and then he left the apartment.

When Williams left the apartment, Winters was in his bedroom in the apartment. Approximately fifteen minutes after leaving his apartment, Williams returned with the heroin. Williams had obtained one-half gram of heroin worth $50 from Black.

Butterbaugh, Peterson and Defendant were waiting in Williams's living room when he returned. Williams walked into the kitchen with Defendant and gave Defendant one-quarter gram of the heroin. The two then went into the living room. Defendant gave Butterbaugh the one-quarter gram quantity of heroin, and Butterbaugh gave Defendant cash. Defendant gave $20 of the cash to Williams. Williams testified that he told Butterbaugh, Peterson and Defendant to be careful because the heroin was "pretty good stuff."

Butterbaugh and Peterson then returned to Peterson's apartment with the one-quarter gram of heroin. Butterbaugh, Peterson and Polly Greene injected the heroin while in Peterson's bedroom. Soon thereafter, Butterbaugh lay down on the floor. Peterson and Polly Greene attempted to arouse Butterbaugh with no success. Polly Greene left Peterson's apartment to take Nicole Greene to Peterson's niece's house. After Polly Greene returned to Peterson's apartment, Polly Greene and Peterson discussed calling rescue personnel because Butterbaugh was still unconscious. When Butterbaugh seemed to be having difficulty breathing, Polly Greene called 911. Butterbaugh was transported to St. Luke's Hospital by rescue personnel where he was pronounced dead.

Dr. Ruth Macke, a pathologist, performed an autopsy on Butterbaugh. The Linn County Medical Examiner, Dr. Donald Linder, testified that the cause of Butterbaugh's death was respiratory arrest due to heroin use. An enlarged heart contributed to Butterbaugh's death.

Winters testified as a government witness. He stated that he shared an apartment with Williams for a few months in and around October of 2004. Prior to October of 2004, Winters, Defendant and Williams used heroin together at both Defendant's apartment and

at Williams's apartment. While he lived with Williams, a lot of drugs went in and out of the apartment. Williams dealt drugs, and both he and Williams were heroin users. According to Winters, on the night before Butterbaugh died, Winters walked out of his bedroom and saw Williams, Butterbaugh and Defendant in the kitchen of the apartment. He did not see what they were doing, and he did not recall engaging in any conversation with any of them. He stated that he did not know all of the people present that night and was reluctant to become involved with them.

### IV. *STANDARD OF REVIEW*

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Under Rule 33, district courts are granted broad discretion in considering motions for a new trial. *United States v. Wilkins*, 139 F.3d 603, 604 (8th Cir. 1998). "Motions for a new trial based on newly discovered evidence are disfavored." *United States v. Dogskin*, 265 F.3d 682, 685 (8th Cir. 2001). To succeed in his request for a new trial based on a claim of newly discovered evidence, Defendant must satisfy the following factors:

> (1) the evidence must have been discovered after trial; (2) the failure to discover must not be attributable to a lack of due diligence on the part of the movant; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material; and (5) the evidence must be likely to produce an acquittal if a new trial is granted.

*United States v. Duke*, 255 F.3d 656, 659 (8th Cir. 2001) (citing *United States v. Ryan*, 153 F.3d 708, 713 (8th Cir. 1998)).

"'A motion for new trial based on newly discovered evidence may be decided ordinarily upon affidavits without a hearing.'" *United States v. Begnaud*, 848 F.2d 111, 113 (8th Cir. 1988) (quoting *United States v. Ward*, 544 F.2d 975, 976 (8th Cir. 1976)). "The necessity for a hearing is lessened in cases involving challenged testimony where the

trial judge has had the opportunity to observe the demeanor and weigh the credibility of the witness at trial." *Id.* (citing *Ward*, 544 F.2d at 976). Further, "the failure to request an evidentiary hearing militates against a holding that the failure to grant one is an abuse of discretion." *Id.* (citing *United States v. Bednar*, 776 F.2d 236, 239 (8th Cir. 1985)).

In his Motion, Defendant did not request an evidentiary hearing. The court finds that the agents' interview of Snyder, documented in Government Exhibit 1, combined with the court's personal evaluation of the evidence presented at trial, provide ample information for the court's determination. Accordingly, no evidentiary hearing is warranted.

## V. THE "NEWLY DISCOVERED EVIDENCE"

On August 25, 2006, several weeks after Defendant's conviction in the instant case, Drug Enforcement Agency Special Agent Chris York ("SA York") and Drug Enforcement Agency Task Force Officer Dave Dostal ("TFO Dostal") interviewed Snyder in the federal building in Cedar Rapids regarding, among other things, Snyder's knowledge of Butterbaugh's heroin overdose on October 13, 2004. The agents conducted the interview because Snyder was attempting to cooperate with the government in hopes of securing a motion for a sentence reduction.[2] Apparently, the government made defense counsel aware of the substance of the interview, although he might not have been given a copy of the report that was generated after the interview. (*See* Gov't Ex. 1).[3] The court notes that Snyder was not under oath when he gave the statements memorialized in Government Exhibit 1 and Defendant has not produced in an affidavit from Snyder.

---

[2] During Snyder's proffer interview, he gave additional information on other individuals in an attempt to secure a motion for a sentence reduction on his pending federal methamphetamine charges. *See Snyder*, 2006 U.S. Distr. LEXIS 57136, at *1-2.

[3] Defense counsel's alleged summary of the substance of the statements Snyder gave on August 25, 2006, conflicts with Government Exhibit 1, which is a Form DEA-6. There is nothing in the record that supports the defense attorney's rendition of the substance of Snyder's August 25, 2006 interview.

7

Snyder informed SA York and TFO Dostal that he was incarcerated at the Linn County Jail with Winters in "F" block. According to Snyder, he overheard Winters talking aloud to himself. Winters was saying something to the effect of, "[h]ope they don't find that out," "[h]ope they don't hear that" or "[h]ope that don't come out." (Gov't Ex. 1). Snyder asked Winters what he was talking about, and Winters explained that Defendant was currently on trial in federal court for the overdose death of Butterbaugh and he did not want his involvement in Butterbaugh's death to come to light. Winters said that he was the person who gave the heroin to Williams and that Williams gave the heroin to Butterbaugh. Winters said that Defendant "had nothing to do with distributing the heroin to Butterbaugh." (Gov't Ex. 1). Winters explained that he was living with Peterson at the time of Butterbaugh's death. Winters did not want Peterson to know that he was distributing heroin out of their apartment, so he gave the heroin to Williams instead of giving it directly to Butterbaugh. Winters claimed he obtained the heroin from his brother-in-law, a black male from Chicago, Illinois, but Winters did not give Snyder any other information about his heroin source.

## VI. ANALYSIS

### A. *Parties' Arguments*

In his Motion, Defendant asserts that newly discovered evidence exists that warrants a new trial. Specifically, Defendant alleges that government witness Winters recanted his trial testimony.

In its Resistance, the government asserts that the newly discovered evidence is not a recantation of Winters's trial testimony but only impeachment evidence. The government concedes that Snyder's information was not and could not have been discovered prior to Defendant's trial. It also concedes that the new evidence would be material to Defendant's case. The government argues that a new trial is not warranted because the information

8

provided by Snyder would do little more than impeach Winters and would not likely result in an acquittal in a second trial.

## B. Legal Analysis

In analyzing Defendant's Motion, the court considers the five factor test. *See Duke*, 255 F.3d at 659 (providing the five factors that a defendant must prove to succeed in a request for a new trial based on a claim of newly discovered evidence).

### 1. *Material evidence discovered after trial through no fault of Defendant*

Defendant can establish the first, second and fourth factors, in that Snyder's information was not discovered prior to trial, Defendant's failure to discover the information was not "attributable to a lack of due diligence" on his part and the evidence is material. Accordingly, Defendant must only prove the final two factors to succeed in his request for a new trial.

### 2. *Impeaching evidence*

Defendant argues that, in a new trial, Snyder would testify that Snyder heard Winters say that Winters was the person who provided the heroin to Williams who, in turn, provided it to Butterbaugh. Defendant has not shown that Winters would recant his testimony. Defendant has only claimed that Snyder would testify that Winters told him a different version of events. Accordingly, the court finds that the information provided by Snyder would only serve to impeach Winters's testimony and, therefore, does not warrant a new trial. *See United States v. Johnson*, 450 F.3d 366, 373 (8th Cir. 2006) (holding that the testimony from others that a witness recanted his testimony is merely impeaching evidence and not a basis for granting a new trial).[4]

---

[4] Defendant alleges that Snyder's testimony could be used to impeach Williams, because Snyder overheard Winters talking to Williams. There is nothing in the record to establish that Snyder ever made the allegation that he overheard Winters talking to Williams. According to Government Exhibit 1, Snyder overheard Winters talking to

(continued…)

### 3. *Not likely to produce an acquittal*

The information provided by Snyder in an unsworn statement to law enforcement agents would not likely result in an acquittal if the court were to grant Defendant a new trial. The allegations made by Snyder during his interview are not worthy of belief for the following reasons.

The alleged circumstances surrounding Winters's statements to Snyder are suspect. Snyder stated that he overheard Winters talking to himself about the distribution of heroin to Butterbaugh. Then, after Winters said that he hoped no one found out about his involvement in the heroin distribution, he allegedly "confessed" to Snyder. The court has not been advised of any special relationship between Snyder and Winters or any corroborating circumstances. It is well known by inmates at the Linn County Jail that other inmates are eager to "jump their case" and promptly report every conversation with another prisoner in hopes of earning a sentence reduction for cooperating with the government. Thus, it is extremely unlikely that Winters would confess to another federal prisoner awaiting disposition of his own charges.

Further, several portions of Snyder's statement are contradicted by the evidence presented at trial. First, Snyder stated that, during their jailhouse conversation, Winters told Snyder that he was living with Peterson. Conversely, Winters testified at trial that he shared an apartment with Williams. This trial testimony was corroborated by Williams, Polly Greene and Nicole Greene. Williams testified that he shared a one-bedroom apartment with Winters. Williams explained that, because Winters had a girlfriend,

---

[4](…continued)
himself, not to Williams. Because Williams was not involved in Winters's alleged recantation, Snyder's information could not be used to impeach Williams. Even if Defendant's facts are true and Snyder's information could be used to impeach Williams, the court would still find that a new trial is not warranted. The new evidence would still be mere impeachment evidence, and Defendant could not satisfy prong three of the test. *See Duke*, 255 F.3d at 659.

Winters slept in the bedroom in the apartment. Polly Greene and Nicole Greene testified that they lived with Peterson on October 13, 2004, and neither indicated that Winters also resided there.

Second, Snyder stated that Winters confessed to being the person who obtained the heroin initially and transferred it to Williams who, in turn, transferred it to Butterbaugh. During trial, Winters denied any involvement in the transaction. Winter's trial testimony was corroborated by Williams's testimony. Williams testified that he obtained the heroin from Black and transferred it to Defendant who, in turn, transferred it to Butterbaugh. Williams, Defendant's cooperating co-defendant, had no apparent motive for implicating himself, Black and Defendant and not Winters.

According to Snyder, Winters explained to Snyder that he gave the heroin to Williams instead of giving it directly to Butterbaugh because he did not want Peterson to know that he was distributing heroin out of Peterson's apartment. The credible testimony at trial was that the heroin transaction occurred at Williams's apartment and not at Peterson's apartment. Winters lived with Williams and not Peterson. Further, this explanation is nonsensical because Peterson was one of the persons requesting the heroin.

Finally, even if the court had found that a jury would view Snyder's information to be credible, it would not warrant granting Defendant a new trial, as it would not likely produce an acquittal. Defendant distributed heroin twice on October 13, 2004. The new evidence does nothing to disturb the trial testimony regarding the first distribution of heroin by Defendant which occurred between 3:00 p.m. and 4:00 p.m. The statements allegedly made to Snyder by Winters did not touch on the first transaction. Polly Greene testified that Defendant provided Butterbaugh, Peterson and herself with heroin around 3:00 p.m. or 4:00 p.m. on October 13, 2004. Her testimony was corroborated by Nicole Greene, who testified that she saw Butterbaugh give money to Defendant, saw Defendant leave the apartment, saw Defendant return five minutes later and saw Defendant, Butterbaugh,

Peterson and Polly Greene go into a back bedroom. Even if Snyder's testimony would call into doubt Defendant's involvement in the second distribution of heroin, which occurred at approximately 5:30 p.m., there was sufficient evidence to prove that Defendant distributed heroin earlier in the afternoon and, therefore, sufficient evidence to support the guilty verdict.

## *VII. CONCLUSION*

Defendant is not entitled to a new trial based on this newly discovered evidence because he has not shown that the evidence would have been used for more than an attempted impeachment of Winters. *Duke*, 255 F.3d at 659. Defendant has also failed to prove that the addition of this evidence is "likely to produce an acquittal" in a second trial. *Id*.

**IT IS SO ORDERED:**

The court **DENIES** Defendant Travis Grover's Motion for New Trial (docket no. 82).

**DATED** this 20th day of December, 2006.

*[signature]*
LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA