**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ‖ | |
| Plaintiff, | ‖ | No. 06-CR-40-LRR |
| vs. | ‖ | |
| TRAVIS GROVER, | ‖ | **SENTENCING MEMORANDUM** |
| Defendant. | ‖ | |

―――――――――――――

### *TABLE OF CONTENTS*

I.     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

II.    *RELEVANT PRIOR PROCEEDINGS* . . . . . . . . . . . . . . . . . . . . . . . *2*

III.   *FACTUAL FINDINGS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*

IV.   *THREE-STEP PROCESS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*

V.    *PRE-DEPARTURE ADVISORY SENTENCING GUIDELINES RANGE* . . *8*

     A.     *Base Offense Level* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*

     B.     *Acceptance of Responsibility* . . . . . . . . . . . . . . . . . . . . . . . . *13*

     C.     *Criminal History Category* . . . . . . . . . . . . . . . . . . . . . . . . . . *15*
            1.    *Prior criminal history* . . . . . . . . . . . . . . . . . . . . . . . . . . *15*
            2.    *Criminal history calculation* . . . . . . . . . . . . . . . . . . . . . *19*
            3.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *21*

     D.     *Pre-Departure Advisory Sentencing Guidelines Range* . . . . . . . . . *22*

VI.   *UPWARD DEPARTURE PURSUANT TO USSG §4A1.3* . . . . . . . . . . . *22*

     A.     *Seriousness of Defendant's Criminal History* . . . . . . . . . . . . . . *23*

     B.     *Likelihood that Defendant Will Commit Other Crimes* . . . . . . . . . . *24*

     C.     *Extent of Departure* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *26*

**VII.  UPWARD DEPARTURE PURSUANT TO USSG §5K2.1 OR §5K2.21** . . .  **26**

 **A.  General Principles** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

 **B.  USSG §5K2.1** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

  **1.  Applicability of Departure** . . . . . . . . . . . . . . . . . . . . . . . **29**

  **2.  Extent of Departure** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

 **C.  USSG §5K2.21** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

**VIII.  VARIANCE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

 **A.  Sentence to be Imposed** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

 **B.  Alternative Sentences** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

**IX.  UNDISCHARGED TERMS OF IMPRISONMENT** . . . . . . . . . . . . . . . . **35**

**X.  RESTITUTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **38**

**XI.  CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **39**

## I.  INTRODUCTION

A jury found Defendant Travis Grover guilty of distributing of heroin, in violation of 21 U.S.C. § 841(a)(1).  He now appears before the court for sentencing.

## II.  RELEVANT PRIOR PROCEEDINGS

On April 6, 2006, the grand jury charged Defendant and Shaun Williams in a one-count Indictment.  The Indictment charged that, on or about October 13, 2004, Defendant and Williams knowingly and intentionally distributed and aided and abetted the distribution of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, to Stan Butterbaugh, resulting in the death of Butterbaugh from the use of the heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

On May 11, 2006, Williams appeared before a United States magistrate judge and pled guilty to the offense.  On May 26, 2006, the undersigned accepted Williams's guilty

2

plea. The court later sentenced Williams to 240 months of imprisonment.[1]

On May 30 and 31, 2006, Defendant was tried before a jury. On June 1, 2006, the jury found Defendant guilty of distributing heroin or aiding and abetting the distribution of heroin, as charged in the Indictment. Verdict (docket no. 61) at 1. In response to a special interrogatory, however, the jury stated that it was unable to unanimously find, beyond a reasonable doubt, that Butterbaugh died as a result of Defendant's heroin distribution. *Id.* at 2.

On October 26, 2006, the United States Probation Office ("USPO") prepared a Presentence Investigation Report ("PSIR"). On October 30, 2006, the USPO revised the PSIR. On November 7, 2006, the government and Defendant filed their respective sentencing memoranda. In their sentencing memoranda, the parties addressed whether the court should depart upward pursuant to USSG §4A1.3 (Inadequacy of Criminal History Category) and USSG §5K2.1 (Death).

On December 19, 2006, the court gave the government and Defendant notice that it was considering departing upward pursuant to USSG §5K2.21 (Dismissed and Uncharged Conduct). *See* Notice (docket no. 91) at 1. On December 20, 2006, the government filed a supplemental sentencing memorandum, in which it discussed the propriety of such a departure.

On December 22, 2006 and February 1, 2007, the court held a sentencing hearing ("Hearing"). Defendant was personally present and represented by his attorney,

---

[1] Under the advisory Sentencing Guidelines, Williams had a total Offense Level of 35 and was a Criminal History Category VI. His advisory Sentencing Guidelines range was 292 to 365 months of imprisonment. Pursuant to USSG §5K1.1 (Substantial Assistance to Authorities), the court departed downward to an advisory Guidelines Sentence of 240 months of imprisonment. After considering all of the factors at 18 U.S.C. § 3553(a), the court imposed a sentence of 240 months of imprisonment.

3

Christopher A. Clausen. Assistant United States Attorney Charles J. Williams represented the government. At the Hearing, the court pronounced sentence in a manner consistent with the instant Sentencing Memorandum.

### III. FACTUAL FINDINGS

Based on the evidence presented at Defendant's trial, the court finds the government has proven the following facts by a preponderance of the evidence:[2]

---

[2] The court is not bound by the jury's inability to find, beyond a reasonable doubt, that Defendant's heroin distribution was the cause of Butterbaugh's death. *See, e.g., United States v. Adams*, 451 F.3d 471, 472-73 (8th Cir. 2006), *cert. denied*, 2007 WL 91546 (U.S. Jan. 16, 2007); *United States v. McKay*, 431 F.3d 1085, 1094-95 (8th Cir. 2005), *cert. denied*, 126 S. Ct. 2345 (2006) and 127 S. Ct. 46 (2006); *see also Cunningham v. California*, No. 05-6551, 2007 WL 135687, at *19 n.4, 549 U.S. ___, ___ n.4 (Jan. 22, 2007) (Alito, J., dissenting) ("Every Court of Appeals to address the issue has held that a district court sentencing post-*Booker* may rely on facts found by the judge by a preponderance of the evidence." (citing, in part, *United States v. Pirani*, 406 F.3d 543, 551 n.4 (8th Cir. 2005))).

At the Hearing, Defendant also urged the court to follow *United States v. Wendelsdorf*, 423 F. Supp. 2d 927, 937-40 (N.D. Iowa 2006) and increase the burden of proof upon the government as the extent of the upward departure increases. The court declines to follow *Wendelsdorf*. *Wendelsdorf* relied, in large part, on *United States v. Kikumura*, 918 F.2d 1084 (3d Cir. 1990) (citing *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986) (stating, in dictum, that a sentencing enhancement should not become "the tail which wags the dog of the substantive offense")). *Kikumura* is no longer good law, insofar as subsequent Supreme Court cases have completely eroded its jurisprudential basis. *See Blakely v. Washington*, 542 U.S. 296, 304 (2004) (discussing *McMillan* and making clear that a constitutional violation only occurs when the court makes a factual finding by a preponderance of the evidence to "authorize a sentence in excess of that otherwise allowed for the underlying offense"). A panel of the Third Circuit Court of Appeals recently recognized the same. *United States v. Grier*, 449 F.3d 558, 569-70 (3d Cir.) (overruling *Kikumura* in light of *Blakely*), *vacated and reh'g en banc granted by* 453 F.3d 554 (3d. Cir. 2006). Even if the court had the discretion to apply a higher burden of proof, it would decline to do so. The court also declines to automatically impose a downward

(continued…)

4

During 2003 and 2004, Defendant was a middleman in the heroin trade in Cedar Rapids.[3] Defendant helped other persons secure heroin, in exchange for a "free high," that is, a portion of the heroin sold. For example, Defendant twice obtained heroin for Butterbaugh, Jeremy Carstens and Ryan Polanski in 2003 or 2004. On both occasions, the three heroin users paid Defendant for heroin, which he promptly obtained. Defendant then used some of the heroin.

In October of 2004, Polly Greene and Shane Peterson, two long-time paramours and intravenous heroin users, were using heroin at least once a week with Butterbaugh. On October 13, 2004, at about 10:00 or 11:00 a.m., Butterbaugh went to the apartment Greene and Peterson shared in Cedar Rapids. The three addicts decided to buy heroin to use together. After unsuccessfully attempting to buy heroin from other drug dealers, Butterbaugh called Defendant. Defendant told Butterbaugh that Defendant could get them heroin later in the afternoon.

Around 3:00 or 4:00 p.m., Butterbaugh, Peterson and Greene went to Defendant's apartment for the heroin. Greene, who was pregnant, brought her minor daughter with her. In the apartment, Butterbaugh gave Defendant $100. Defendant made some phone calls and then met someone outside in an adjacent parking lot. About five minutes later,

---

[2](...continued)

variance equal to the upward departure. *See Wendelsdorf*, 423 F. Supp. 2d at 938-40 ("[I]n cases where acquitted or uncharged conduct is proved by a preponderance, but not by clear and convincing evidence, and the circumstances are extreme, then a sentencing court metes out the upward departure . . . , but departs downwardly in the same exact amount of the upward departure." (adopting *United States v. Gigante*, 94 F.3d 53 (2d Cir. 1996) and its progeny to "neutraliz[e] the effects of any upward adjustment" under the advisory Sentencing Guidelines)).

[3] In Cedar Rapids, heroin is commonly known as "diesel."

Case 1:06-cr-00040-LRR   Document 104   Filed 02/01/07   Page 5 of 40

Defendant returned to the apartment with some heroin. Butterbaugh, Peterson, Greene, Defendant and Defendant's girlfriend used some of the heroin intravenously. Between 4:30 and 5:30 p.m., Butterbaugh, Peterson, Greene and her daughter left Defendant's apartment.

Later that evening, Butterbaugh called Defendant and asked for more heroin. Butterbaugh and Peterson drove back to Defendant's apartment. Greene and her daughter stayed home.

Around 5:30 or 6:00 p.m., Butterbaugh, Peterson and Defendant met Williams at Williams's apartment in Cedar Rapids.[4] Butterbaugh, Peterson and Defendant asked Williams if he could get them some heroin. Williams explained that he had already called his source, a man known as "Black." Williams left the apartment and bought one-half gram of heroin from Black for $50.

When Williams returned to his apartment, Butterbaugh, Peterson and Defendant were waiting in the living room. Williams took Defendant into the kitchen and gave Defendant one-quarter gram of the heroin. The two then went into the living room. Defendant gave Butterbaugh the one-quarter gram of heroin, and Butterbaugh gave Defendant an unknown amount of cash. Defendant gave $20 of the cash to Williams.

As Defendant, Butterbaugh and Peterson left Williams's apartment, Williams told them to "be careful" because the heroin was "pretty good stuff."

When Butterbaugh and Peterson returned to Peterson's and Greene's apartment, they had heroin. Butterbaugh, Peterson and Greene got high in Peterson's bedroom, while Greene's daughter stayed in the living room. Butterbaugh and Peterson also drank beer;

---

[4] Beginning in July or August of 2004, Defendant and Williams supplied each other with heroin from time-to-time, depending on who had a source. During 2004, Defendant and Williams used heroin together about two to three times per week.

6

Butterbaugh and Peterson had been drinking beer since about noon.

Soon thereafter, Butterbaugh lay himself down on the floor. Peterson and Greene periodically attempted to arouse Butterbaugh without success. About an hour and a half after he fell unconscious, Butterbaugh began to have difficulty breathing. Greene called 9-1-1.

When emergency personnel arrived, they unsuccessfully tried to revive Butterbaugh. They transported Butterbaugh to St. Luke's Hospital, where he was pronounced dead.

Dr. Ruth Macke, a pathologist, performed an autopsy on Butterbaugh, at the request of the Linn County Medical Examiner, Dr. Donald Linder. Relying, in part, on Dr. Macke's autopsy report, Dr. Linder concluded that the cause of Butterbaugh's death was respiratory arrest due to heroin usage. Dr. Linder noted that a contributing factor in Butterbaugh's death was an enlarged heart.

In sum, the court finds that the government has met its burden to prove, by a preponderance of the evidence, that Defendant sold Butterbaugh heroin and that such heroin resulted in his death. Defendant twice sold heroin to Butterbaugh, and such heroin directly and proximately caused Butterbaugh's death.

Where appropriate, the court makes additional factual findings in later portions of the instant Sentencing Memorandum.

### IV. THREE-STEP PROCESS

The Sentencing Guidelines are no longer mandatory. *United States v. Haack*, 403 F.3d 999, 1002 (8th Cir.) (discussing *United States v. Booker*, 543 U.S. 220 (2005)), *cert. denied*, 126 S. Ct. 276 (2005)). They are advisory. *Id.* The Eighth Circuit Court of Appeals has explained that, in the post-*Booker* world, "there are essentially three steps to determining an appropriate sentence." *United States v. Sitting Bear*, 436 F.3d 929, 934 (8th Cir. 2006).

> First, the district court should determine the applicable
> Sentencing Guidelines range without consideration of any
> Guidelines departure factors, because the Guidelines remain an
> important sentencing factor. *See* 18 U.S.C. § 3553(a)(4).
> Second, the district court, where appropriate, should consider
> the departure provisions contained in Chapter 5, Part K and/or
> §4A1.3 of the Guidelines, as those sentencing provisions have
> not been excised by *Booker*. The resulting range is the
> post-*Booker* advisory Guidelines range. Third, the district
> court should consider the rest of the § 3553(a) factors in
> determining whether to impose the "Guidelines sentence" as
> determined in the prior steps or a "non-Guidelines sentence"
> driven by the other § 3553(a) considerations, and sentence the
> defendant accordingly. *Haack*, 403 F.3d at 1003; *see also*
> *United States v. Denton*, 434 F.3d 1104, 1114 (8th Cir. 2006)
> (reviewing the sentence imposed by the district court under the
> three-part *Haack* methodology).

*Id.* at 934-35. In what follows, the court adheres to this three-step process.

## V. PRE-DEPARTURE ADVISORY SENTENCING GUIDELINES RANGE

### A. Base Offense Level

The parties do not dispute that USSG §2D1.1 is the applicable sentencing guideline section for Defendant's violation of 21 U.S.C. § 841(a)(1). *See* USSG App. A. They disagree about the drug quantity that should be attributed to Defendant.

The USPO recommends that the court hold Defendant accountable for at least fifteen grams of heroin. PSIR at ¶ 21. According to the PSIR, the government has the following information:

> 1. PSIR at ¶ 9 (attributing six grams to Defendant): Williams
> supplied Defendant with half-gram quantities of heroin once a
> week during a three- or four-month period in late 2004.
>
> 2. PSIR at ¶ 10 (attributing six grams to Defendant): Williams
> bought half-gram quantities of heroin from Defendant two to

8

three times a week from December of 2005 through January or February of 2006.

3.   PSIR at ¶ 11 (attributing one gram to Defendant): Defendant sold Butterbaugh one gram of heroin for $100 on the afternoon of October 13, 2004.

4.   PSIR at ¶ 12 (attributing one-quarter gram to Defendant): Defendant bought one-quarter gram of heroin from Williams and then sold it to Butterbaugh on the evening of October 13, 2004.

5.   PSIR at ¶ 14 (attributing three grams to Defendant): Defendant and Williams bought three grams of heroin from Matt Fountain in 2004.

6.   PSIR at ¶ 15 (attributing two grams to Defendant): on two occasions in the summer or fall of 2004, Defendant supplied Butterbaugh with one gram of heroin.

Based on these allegations, the USPO conservatively estimates that Defendant is responsible for fifteen grams of heroin, PSIR at ¶ 16, and, therefore, Defendant's base offense level should be **16**.  *Id.* at ¶ 21 (citing USSG §2D1.1(a)(3) and (c)(12) (setting a base offense level of **16** if defendant is accountable for at least 10 grams but less than 20 grams of heroin)).[5]   The USPO made its recommendations based solely upon the government's Offense Conduct Statement and information in the government's discovery file, not the evidence presented at trial.  *Id.* at ¶ 8.[6]

---

[5] Concerned about potential double counting, the USPO recommends that the court not separately assess the heroin in PSIR paragraphs 11, 12 and 15.

[6] The USPO did not have access to the trial transcript when it prepared the PSIR, because the court reporter had not yet prepared it.

9

The government urges the court to accept the USPO's recommendation and states generally that the USPO's recommendation is accurate. The government relies solely on the evidence presented at trial but does not cite specific testimony at trial that supports its drug quantity calculation. The government did not present any additional evidence at the Hearing.[7]

Defendant objects to the drug quantity attributed to him in the PSIR. He contends that the government's evidence is suspect, because it is based upon the testimony of co-conspirators and cooperating witnesses. Defendant opines, without explanation, that "the only reliable information relating to drug quantity would place him at less than five grams of heroine [sic], which would be a base offense level of **12**." Letter from Attorney Clausen to USPO ("Objections") at ¶¶ 1-3 (emphasis added).

The government bears the burden to prove drug quantity under USSG §2D1.1 by a preponderance of the evidence. *United States v. Marshall*, 411 F.3d 891, 894 (8th Cir. 2005). The court "may consider any evidence in its sentencing determination that has sufficient indicia of reliability to support its probable accuracy." *Id.* The court may rely upon the testimony of witnesses, including cooperating co-conspirators, to establish the appropriate drug quantity. *See United States v. Quintana*, 340 F.3d 700, 702 (8th Cir. 2003) (relying on the testimony of witnesses); *see also United States v. Sarabia-Martinez*, 276 F.3d 447, 450-51 (8th Cir. 2002) (stating that district court may rely upon co-conspirator testimony and relying on testimony of cooperating witness). "'The district

_____

[7] In its sentencing memorandum, the government repeatedly implies that the minimum drug quantity for a base offense level **16** is fifteen grams of heroin. The government overstates its burden. The government must only prove that Defendant is responsible for ten grams of heroin. *See* USSG §2D1.1(a)(3) and (c)(12) (setting a base offense level of **16** if defendant is accountable for at least 10 grams but less than 20 grams of heroin).

10

court is free to believe all, some, or none of [a] witness's testimony.'" *United States v. Moore*, 212 F.3d 441, 446 (8th Cir. 2000) (quoting *United States v. Carter*, 997 F.2d 459, 461 (8th Cir. 1993)). The advisory Sentencing Guidelines "permit a district court to approximate the quantity of drugs for sentencing purposes where . . . there has been no direct seizure of drugs directly establishing the relevant amount." *United States v. Frazier*, 280 F.3d 835, 851 (8th Cir. 2002) (citing, in part, USSG §2D1.1, cmt. (n.12)).

The court has reviewed the trial evidence and finds that the government has not proved that Defendant is responsible for fifteen grams of heroin. The government did not present evidence, either at trial or the Hearing, that fully supports the assertions in the PSIR. Although a number of the government's witnesses credibly testified that Defendant was involved in the heroin trade in Cedar Rapids, there is little evidence in the record about the specific quantities of heroin that he was dealing. There is also very little evidence about the prices at which Defendant sold his heroin; if the court knew the prices, it might be able to infer quantity. DEA Special Agent Jarad Harper credibly testified at trial that, in the Cedar Rapids area, a gram of heroin costs between $250-$400; a half-gram of heroin costs between $100-$200; and a quarter-gram of heroin costs between $50-$100.

With respect to each of the government's allegations, the court makes the following factual findings:

> 1. PSIR at ¶ 9: There is insufficient evidence in the record to prove that Williams supplied Defendant with six grams of heroin in fall and winter of 2004. Williams testified that he and Defendant used heroin together two to three times per week in 2004. Williams testified that sometimes Defendant would supply the heroin. On other occasions, Williams would supply it. Notably, Williams did not testify to quantity or price. Accordingly, the court shall not attribute any quantity of heroin to Defendant.

11

2.   PSIR at ¶ 10: There is no evidence in the record that Williams bought half-gram quantities of heroin from Defendant two to three times a week from December of 2005 through January or February of 2006.  Accordingly, the court shall not attribute any quantity of heroin to Defendant.

3.   PSIR at ¶ 11: The court finds that Defendant sold Butterbaugh one-half gram of heroin for $100 during the afternoon of October 13, 2004.  Greene testified that, on the morning of October 13, 2004, Butterbaugh wanted $100 worth of heroin.   This price indicates that Butterbaugh wanted approximately one-half gram of heroin.  It is also consistent with Greene's testimony that, on the afternoon of October 13, 2004, she witnessed Butterbaugh hand Defendant an unknown amount of cash, and Defendant later returned with enough heroin for Butterbaugh, Greene, Peterson and Defendant to share. Greene's daughter corroborated the facts that money changed hands, Defendant briefly left the apartment and then the adults went back to the bedroom, presumably to use heroin.  Accordingly, the court shall attribute **one-half gram** of heroin to Defendant.

4.   PSIR at ¶ 12: The court finds that Defendant bought one-quarter gram of heroin from Williams and then sold it to Butterbaugh.  Williams credibly testified that he bought one-half gram from his source, Black, and gave one-quarter gram of it to Defendant, who in turn sold it to Butterbaugh. Although Greene implied on cross-examination that Defendant sold Butterbaugh one-gram of heroin,[8] the court finds Williams's testimony more credible.  Accordingly, the court shall attribute **one-quarter gram** of heroin to Defendant.

5.   PSIR at ¶ 14: There is no evidence in the record that Defendant and Williams bought three grams of heroin from

_____

[8] Greene testified that, when Peterson and Butterbaugh returned, she got one-quarter gram, Peterson got one-quarter gram and Butterbaugh got one-half gram.

Case 1:06-cr-00040-LRR   Document 104   Filed 02/01/07   Page 12 of 40

Matt Fountain in 2004. Accordingly, the court shall not attribute any quantity of heroin to Defendant.

6. PSIR at ¶ 15: The court finds that Defendant sold Butterbaugh one-half gram of heroin in late 2004. Carstens credibly testified that he witnessed Butterbaugh give Defendant $100 for a half-gram of heroin approximately two weeks before Butterbaugh's death. Although Carstens also credibly testified that Defendant sold Butterbaugh heroin on one other occasion in 2003 or 2004, the government did not present evidence regarding the quantity of heroin or amount of money involved. Therefore, the court cannot estimate the drug quantity involved in this other transaction. Accordingly, the court shall attribute **one-half gram** of heroin to Defendant.

In sum, the court finds by a preponderance of the evidence that Defendant is responsible for **one and one-quarter grams** of heroin.[9] Therefore, **Defendant's base offense level is 12**. USSG §2D1.1(a)(3) and (c)(14) (setting base offense level at **12** where the defendant is responsible for "[l]ess than 5 G of Heroin").

### B. Acceptance of Responsibility

In its entirety, USSG §3E1.1 provides:

**§3E1.1. Acceptance of Responsibility**

**(a)** If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by **2** levels.

**(b)** If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of

---

[9] At trial, there was some evidence that Defendant was responsible for more heroin. For example, Greene testified that she and Peterson were daily heroin users and that Defendant sold them heroin "a couple of times" in 2004. Greene did not, however, testify to any quantities or prices.

13

> subsection (a) is level **16** or greater, and upon motion of the
> government stating that the defendant has assisted authorities
> in the investigation or prosecution of his own misconduct by
> timely notifying authorities of his intention to enter a plea of
> guilty, thereby permitting the government to avoid preparing
> for trial and permitting the government and the court to
> allocate their resources efficiently, decrease the offense level
> by **1** additional level.

USSG §3E1.1 (emphasis in original). "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." *Id.*, cmt. (n.2). "Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction." *Id.* Defendant bears the burden to prove, by a preponderance of the evidence, that he has accepted responsibility. *Peters v. United States*, 464 F.3d 811, 812 (8th Cir. 2006) (stating that the burden is on the defendant).

In the PSIR, the USPO stated that "defendant has not demonstrated anything to the [USPO] which would clearly reflect an acceptance of responsibility for his conduct." PSIR at ¶ 19. In his response to the PSIR, Defendant objected. Objections at ¶ 4. He claimed that he never denied involvement with the distribution of heroin. *Id.* He pointed out that he did not testify at trial or offer any evidence on his behalf. *Id.* At the Hearing, however, Defendant clarified his position and conceded that he is not entitled to a reduction for acceptance of responsibility.

Accordingly, the court finds that Defendant is not entitled to a reduction for acceptance of responsibility. Defendant went to trial and has not accepted responsibility for his actions in any respect. This is not one of those rare situations in which a defendant who puts the government to its burden of proof at trial is entitled to an acceptance-of-

14

responsibility reduction. USSG §3E1.1; *see, e.g., United States v. Kiel*, 454 F.3d 819, 823-24 (8th Cir. 2006) (affirming denial of acceptance of responsibility under analogous circumstances); *cf.* USSG §3E1.1, cmt. (n.2) (setting forth examples of such "rare situations").

### C. Criminal History Category

#### 1. Prior criminal history

Defendant has a long and serious criminal history, even though he is only thirty-years old:

In May of 1995 (age 18), Defendant was charged with Possession of Drug Paraphernalia, after he was found with a marijuana pipe. PSIR at ¶ 30. In June of 1995, Defendant was convicted and ordered to pay a $50 fine. *Id.* The USPO recommends that Defendant be assessed **one** Criminal History Point for such conviction. *Id.* (citing USSG §4A1.1(c)).

In August of 1995 (age 18), Defendant was charged with Theft in the Fifth Degree, after he stole merchandise from a grocery store. PSIR at ¶ 31. In August of 1995, Defendant was convicted and ordered to pay a $50 fine. *Id.* The USPO recommends that Defendant be assessed **one** Criminal History Point for such conviction. *Id.* (citing USSG §4A1.1(c)).

On June 15, 1996 (age 19), Defendant was charged with Possession of Drug Paraphernalia, after he was found with a small pipe with residue believed to be marijuana. PSIR at ¶ 32. In August of 1996, Defendant was convicted and ordered to pay a $50 fine. *Id.* The USPO recommends that Defendant be assessed **one** Criminal History Point for such conviction. *Id.* (citing USSG §4A1.1(c)).

On June 27, 1996 (age 19), Defendant was charged with Trespassing, after he was caught swimming in a public pool when it was closed. PSIR at ¶ 33. In August of 1996,

Case 1:06-cr-00040-LRR   Document 104   Filed 02/01/07   Page 15 of 40

Defendant was convicted and ordered to pay a $50 fine. *Id.* The USPO recommends that Defendant not be assessed any Criminal History Points for such conviction. *Id.* (citing USSG §4A1.2(c)(1) (excluding trespassing convictions for which only a fine was imposed)).

In August of 1997 (age 20), Defendant was charged with Forgery, after he forged and cashed checks on another person's bank account. PSIR at ¶ 34. In September of 1998, Defendant was convicted and received a five-year prison sentence. *Id.* The entire sentence was suspended, however, and Defendant was placed on five years of probation. *Id.* In 2001 and 2002, Defendant repeatedly violated his probation by failing to keep appointments with his probation officer, submitting urine samples that tested positive for marijuana, cocaine and morphine, and reporting for a substance abuse evaluation with alcohol on his breath. *Id.* In May of 2002, Defendant's probation was revoked and he was sentenced to five years in prison. *Id.* at ¶¶ 34-35. Defendant's prison term was discharged in May of 2003. *Id.* at ¶ 34. The USPO recommends that Defendant be assessed **three** criminal history points for such conviction. *Id.* (citing USSG §4A1.1(a)).

On September 3, 1997 (age 20), Defendant was charged with Possession of Drug Paraphernalia, after he was found in a hotel room "where narcotics and paraphernalia were found." PSIR at ¶ 36. In March of 1998, he was convicted and ordered to pay a $50 fine. *Id.* The USPO recommends that Defendant be assessed **one** Criminal History Point for such conviction. *Id.* (citing USSG §4A1.1(c)).

On September 5, 1997 (age 20), Defendant was charged with Possession of a Controlled Substance, after he was found at a hotel with marijuana. PSIR at ¶ 37. In December of 1997, he was convicted and ordered to pay a $250 fine. *Id.* The USPO recommends that Defendant be assessed **one** Criminal History Point for such conviction. *Id.* (citing USSG §4A1.1(c)).

16

In March of 1998 (age 21), Defendant was charged with Theft in the Fifth Degree and Public Intoxication, after he stole meat from a grocery store while drunk. PSIR at ¶ 38. In March of 1998, Defendant was convicted on both counts and ordered to pay a $50 fine on each count. *Id.* The USPO recommends that Defendant be assessed **one** Criminal History Point for such convictions. *Id.* (citing USSG §4A1.1(c)); *see also id.* §4A1.2(c)(2) (excluding "[p]ublic intoxication" convictions).

In May of 1998 (age 21), Defendant shoplifted an item from a gas station and pushed and elbowed an employee who tried to stop his escape. PSIR at ¶ 39. In June of 1998, Defendant was charged with Robbery in the Second Degree. *Id.* In May of 1999, Defendant pled guilty to Extortion. *Id.* He received a deferred judgment and was placed on five years of probation. *Id.* For the same reasons outlined above in connection with Defendant's 1998 Forgery conviction, Defendant's probation was revoked and, in June of 2002, he was sentenced to five years of prison. *Id.* The sentence was ordered to run concurrently with Defendant's sentence on the 1998 Forgery conviction. *Id.* In May of 2003, Defendant was discharged from prison. *Id.* The USPO recommends that Defendant be assessed **three** criminal history points for the Extortion conviction. *Id.* (citing USSG §4A1.1(a)).

On February 5, 2005 (age 28), Defendant was charged with Theft in the Fifth Degree, after he shoplifted merchandise from a department store. PSIR at ¶ 41. In February of 2005, Defendant was convicted and ordered to pay a $50 fine. *Id.* The USPO recommends that Defendant be assessed **one** Criminal History Point for such conviction. *Id.* (citing USSG §4A1.1(c)).

On February 7, 2005 (age 28), Defendant was charged with Theft in the Fifth Degree, after he stole from a restaurant. PSIR at ¶ 42. On February 24, 2005, Defendant was convicted and ordered to pay a $50 fine. *Id.* The USPO recommends that Defendant

Case 1:06-cr-00040-LRR   Document 104   Filed 02/01/07   Page 17 of 40

be assessed **one** Criminal History Point for such conviction. *Id.* (citing USSG §4A1.1(c)).

In March of 2005 (age 28), Defendant was charged with Theft in the Fifth Degree, after he shoplifted from a grocery store. PSIR at ¶ 43. Defendant was convicted in the same month and ordered to pay a $50 fine. *Id.* The USPO recommends that Defendant be assessed **one** Criminal History Point for such conviction. *Id.* (citing USSG §4A1.1(c)).

On August 8, 2005 (age 28), Defendant was charged with Forgery, after he forged and cashed checks on the account of another in May of 2005. PSIR at ¶ 44. In March of 2006, Defendant was convicted and sentenced to five years of prison. *Id.* The USPO recommends that Defendant be assessed **three** criminal history points for such conviction. *Id.* (citing USSG §4A1.1(a)).

On August 22, 2005 (age 28), Defendant was charged with Theft in the Fifth Degree, after he stole more than $200 worth of drills from a department store. PSIR at ¶ 45. In March of 2006, Defendant was convicted and ordered to pay a $50 fine. *Id.* The USPO recommends that Defendant be assessed **one** Criminal History Point for such conviction. *Id.* (citing USSG §4A1.1(c))

On October 6, 2005 (age 28), Defendant was charged with Interference with Official Acts, after he hindered police offers from serving an arrest warrant on his girlfriend. PSIR at ¶ 46. In December of 2005, Defendant was convicted and ordered to pay a $212 fine. *Id.* The USPO recommends that Defendant not be assessed any Criminal History Points for such conviction. *Id.* (citing USSG §4A1.2(c)(1) (excluding "hindering or failing to obey a police officer" conviction for which only a fine was imposed)).

On October 30, 2005 (age 28), Defendant was charged with Theft in the Fifth Degree, after he stole merchandise from a store. PSIR at ¶ 47. The next day, he was convicted and ordered to pay a $50 fine. *Id.* The USPO recommends that Defendant be assessed **one** Criminal History Point for such conviction. *Id.* (citing USSG §4A1.1(c)).

In November of 2005 (age 28), Defendant was charged with Theft in the Second Degree and Forgery after he presented and cashed another person's checks at a gas station in June of 2005. PSIR at ¶ 48. In February of 2006, Defendant was convicted of Forgery and sentenced to five years of prison. *Id.* The Theft in the Second Degree charge was dismissed. *Id.* The USPO recommends that Defendant not be assessed any Criminal History Points for this Forgery conviction, because the sentence imposed was related to the sentence imposed for Defendant's March of 2006 Forgery conviction. *Id.* (citing USSG § 4A1.2(a)(2)). Both sentences resulted because Defendant wrongfully cashed the checks of the same person. *Id.* However, the checks were cashed at different businesses in different counties, and Defendant was arrested by different law enforcement agencies on separate occasions. *Compare* PSIR ¶ 44, *with id.* ¶ 48

### 2. *Criminal history calculation*

The USPO recommends that Defendant be assessed with a total of **sixteen** criminal history points and, therefore, his Criminal History Category is **VI**. PSIR at ¶ 52. Although the USPO originally totaled twenty criminal history points in accordance with the convictions outlined in Part V.C.1, eleven of those points were assessed pursuant to USSG §4A1.1(c). PSIR at ¶ 49. Because §4A1.1(c) only allows the court to assess four points, the USPO reduced Defendant's criminal history points total by seven points to **thirteen** points. *Id.* The USPO added two points pursuant to USSG §4A1.1(d), however, because Defendant committed the instant federal offense while on probation on his Extortion conviction. *Id.* at ¶ 50. The USPO also added an additional one point pursuant to USSG §4A1.1(e), because Defendant committed the instant federal offense less than two years after release from imprisonment on his Extortion conviction and his 1998 Forgery conviction. *Id.* at ¶ 51.

Defendant unconditionally accepts the USPO's description of his criminal history

and generally concurs in the USPO's calculations of his criminal history points. However, Defendant objects to paragraph 39 of the PSIR, in which the USPO recommends that Defendant be assessed three criminal history points for his Extortion conviction. Defendant points out that he was also assessed three criminal history points for his 1998 Forgery conviction. He maintains that, because he ended up serving time for those two convictions concurrently, it is impermissible "double counting" to assess him three points for each conviction.[10] Defendant cites no authority for his position.

Section 4A1.2 states that "[p]rior sentences imposed in unrelated cases are to be counted separately," but "[p]rior sentences imposed in related cases are to be treated as one sentence for purposes of §4A1.1(a), (b), and (c)." USSG §4A1.2(a)(2). Application Note 3 to USSG §4A1.2 defines "related." It states:

> Prior sentences are not considered related if they were for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense). Otherwise, prior sentences are considered related if they resulted from offenses that (1) occurred on the same occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing.

USSG §4A1.2, cmt (n.3); *see also United States v. Davidson*, 437 F.3d 737, 740 (8th Cir. 2006) (listing nine factors that the court should consider in determining whether prior criminal convictions are part of a single scheme or plan) (citation omitted).

Defendant's 1998 Forgery and Extortion convictions are clearly unrelated. Defendant's 1998 Forgery conviction stemmed from his arrest in August of 1997 for

---

[10] Defendant concedes that, regardless of whether he is assessed the three points, he is still a Criminal History Category VI. For the sake of completeness, the court decides the issue. The court also notes that the resolution of this issue bears on the starting point for the departure issue examined in Part VI.

Case 1:06-cr-00040-LRR   Document 104   Filed 02/01/07   Page 20 of 40

forging and cashing checks on another person's bank account in Linn County, Iowa. PSIR at ¶ 34. Defendant's Extortion conviction stemmed from his arrest in May of 1998 for shoplifting an item from a gas station and pushing and elbowing an employee who tried to stop his escape in Black Hawk County, Iowa. *Id.* at ¶ 39. Thus, the two offenses occurred on different occasions and in different locations. There is no evidence that the two offenses were part of a single common scheme or plan. The two convictions did not result from offenses that were consolidated for trial or sentencing. The cases proceeded under different docket numbers in different counties. Only after Defendant violated his probation in 2001 and 2002 were the two new terms of five years of imprisonment ordered to run concurrently. Although Defendant ultimately ended up serving concurrent prison time on the two sentences, they are still "unrelated" for purposes of USSG §4A1.2(a)(2). *See, e.g., United States v. Paden*, 330 F.3d 1066, 1067-68 (8th Cir. 2003) (rejecting defendant's argument that two convictions occurring four days apart were "functionally consolidated" for purposes of §4A1.2(a)(2), because the defendant pled guilty to both charges on the same date and the sentences ran concurrently); *see also United States v. Piggie*, 316 F.3d 789, 794-96 (8th Cir. 2003) (similar); *United States v. Nicholson*, 231 F.3d 445, 455-56 (8th Cir. 2000) ("Where prior convictions are sentenced under separate docket numbers, and there is no formal order of consolidation, the convictions are counted separately for purposes of §4A1.2(a)(2)." (Citation omitted.)).

Accordingly, the court holds that the USPO accurately calculated Defendant's criminal history. Defendant was properly assessed with **sixteen** criminal history points.

### 3. Conclusion

Because Defendant has **sixteen** criminal history points, he is a **Criminal History Category VI**. *See* USSG Sentencing Table.

21

### D. Pre-Departure Advisory Sentencing Guidelines Range

**At an offense level of 12 and a Criminal History Category VI, the advisory Sentencing Guidelines range, if the court does not depart upward pursuant to Chapter 4 or 5, is 30 to 37 months of imprisonment.** *See* USSG Sentencing Table. The statutory maximum sentence is 240 months of imprisonment. *See* 21 U.S.C. § 841(b)(1)(C) (stating that "such person shall be sentenced to a term of imprisonment of not more than 20 years"). There is no statutory minimum sentence. *See id.*

### VI. UPWARD DEPARTURE PURSUANT TO USSG §4A1.3

The government seeks an upward departure pursuant to USSG §4A1.3. Section 4A1.3 grants the court the discretion to depart upward when

> reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes . . . .

USSG §4A1.3(a)(1). "When contemplating and structuring such a departure, the district court should consider both the nature and extent of a defendant's criminal history." *United States v. Hacker*, 450 F.3d 808, 812 (8th Cir. 2006) (citing *United States v. Gonzales-Ortega*, 346 F.3d 800, 802 (8th Cir. 2003)). "'In deciding the likelihood that a defendant may commit other crimes, a court may take into account any evidence of obvious incorrigibility and conclude that leniency has not been effective.'" *Id.* (citing *United States v. Herr*, 202 F.3d 1014, 1016 (8th Cir. 2000)).

The fact that Defendant is a Criminal History Category VI does not foreclose the possibility of an upward departure pursuant to USSG §4A1.3. *See* USSG §4A1.3, cmt. (n.2(B)); *see also United States v. Hawk Wing*, 433 F.3d 622, 631 (8th Cir. 2006) (discussing upward departures pursuant to USSG §4A1.3 and explaining that if the district court finds that the sentencing range in Criminal History Category VI is inadequate, "then

22

it may impose a reasonable sentence above the Category VI range" (citation omitted)). Indeed, the advisory Sentencing Guidelines provide specific guidance for cases like Defendant's:

> In determining whether an upward departure from Criminal History Category VI is warranted, the court should consider that the nature of the prior offenses rather than simply their number is often more indicative of the seriousness of the defendant's criminal record.

USSG §4A1.3, cmt. (n.2(B)).

### A. Seriousness of Defendant's Criminal History

The court first considers the seriousness of Defendant's criminal history. Not including the instant offense, Defendant has eighteen criminal convictions. Four of the convictions are felony convictions for extortion or forgery. Defendant's remaining convictions are for relatively minor offenses, such as shoplifting and possession of drug paraphernalia.

The court begins with the recognition that Defendant was scored sixteen criminal history points. This exceeds the minimum necessary to qualify for Criminal History Category VI by three points. In reality, however, even this calculation substantially underrepresents the seriousness of Defendant's criminal history. Clearly, the court may consider "[p]rior sentence(s) not used in computing the criminal history category" in determining whether a departure is warranted. USSG §4A1.3(a)(2)(A); *see, e.g.*, *United States v. Porter*, 439 F.3d 845, 848 (8th Cir. 2006) (affirming an upward departure where the court considered two prior criminal convictions that were uncounted pursuant to USSG §4A1.2(e)(3) due to their age).

Defendant was only scored four criminal history points for eleven convictions, because of the limitation in USSG §4A1.1(c). No points were assessed to seven such

Case 1:06-cr-00040-LRR   Document 104   Filed 02/01/07   Page 23 of 40

convictions. Moreover, no points were assessed for Defendant's February of 2006 Forgery conviction, *see* PSIR at ¶ 49, because the sentence imposed was related to the sentence imposed for Defendant's March of 2006 Forgery conviction. *Id.* at ¶ 44 (citing USSG § 4A1.2(a)(2)). Had the February of 2006 Forgery conviction counted, Defendant would have had an additional three points.[11]

Therefore, if all of Defendant's convictions would have been counted, he would have "earned" at least twenty-six criminal history points, rather than the sixteen points he was actually assessed. This would have been at least *twice* the minimum threshold for a Criminal History Category VI. Although the sheer number of Defendant's prior convictions is not dispositive in all cases, USSG §4A1.3, cmt. (n.2(B)), the court finds that the totality of Defendant's record shows that Criminal History Category VI substantially under-represents the seriousness of Defendant's criminal history.

### B. Likelihood that Defendant Will Commit Other Crimes

Defendant has an extremely high risk of recidivism. Defendant has committed crimes almost constantly since he was eighteen-years old. Incarceration appears to be the only way to stop Defendant from committing crimes. Defendant committed the instant federal offense while on probation for his Extortion conviction. PSIR at ¶ 50. Defendant committed the instant federal offense less than two years after release from imprisonment on his Extortion conviction and his 1998 Forgery conviction. *Id.* at ¶ 51. Defendant has shown a lack of respect for authority by repeatedly violating the terms of his probation.

The Eighth Circuit Court of Appeals has summarized a case involving a person who had a criminal history similar to Defendant's:

> [The defendant] has been incarcerated one-half of his adult life

---

[11] The court also notes that Defendant received no points for his Trespassing, Public Intoxication and Interference With Official Acts convictions.

Case 1:06-cr-00040-LRR   Document 104   Filed 02/01/07   Page 24 of 40

> for a wide variety of serious offenses. He has resumed
> criminal activity promptly upon each release from prison,
> committing the instant offenses, and earlier offenses, while on
> parole. It would seem that only incarceration has kept his
> criminal history as low as category IV.

*United States v. Washington*, 109 F.3d 459, 462 (8th Cir. 1997). Defendant's criminal history demonstrates a "proclivity for recidivism." *See United States v. Lara-Banda*, 972 F.2d 958, 959 (8th Cir. 1992). Defendant is an "'unrepentant, incorrigible, recidivist, who poses a significant threat to the safety of the community.'" *United States v. Aguilar-Lopez*, 329 F.3d 960, 963 (8th Cir. 2003) (quoting *Lara-Banda*, 972 F.2d at 960)).

Defendant is the classic case of a "younger defendant[] . . . who [is] more likely to have received lenient treatment [in the past], yet who may actually pose a greater risk of serious recidivism than older defendants." USSG §4A1.3, cmt. (backg'd). For example, Defendant was convicted seven times for Theft in the Fifth Degree, a simple misdemeanor under Iowa law, in violation of Iowa Code § 714.2(5). He received a $50 fine for each conviction, even though imprisonment was a possible sanction. *See* Iowa Code § 903.1(1)(a) ("The court may order imprisonment not to exceed thirty days in lieu of a fine or in addition to a fine."). Moreover, persons with two prior convictions for Theft in the Fifth Degree are subject to a charging enhancement to Theft in the Third Degree, an aggravated misdemeanor, in violation of Iowa Code § 714.2(3). A person convicted of an aggravated misdemeanor is subject to much more severe penalties, including up to two years of imprisonment. *Id.* § 903.1(2). It appears, however, that the authorities never pursued such a charging enhancement against Defendant.

In sum, the court finds that Defendant's criminal history category substantially under-represents the likelihood that he will commit other crimes. USSG §4A1.3(a)(1).

### C. Extent of Departure

Because Defendant's criminal history category substantially under-represents the seriousness of his criminal history and the likelihood that he will commit other crimes, the court finds that an upward departure pursuant to USSG §4A1.3(a)(1) is appropriate. The advisory Sentencing Guidelines instruct on the extent of upward departures for understated criminal history:

> UPWARD DEPARTURES FROM CATEGORY VI.—In a case in which the court determines that the extent and nature of the defendant's criminal history, taken together, are sufficient to warrant an upward departure from Criminal History Category VI, the court should structure the departure by moving incrementally down the sentencing table to the next higher offense level in Criminal History Category VI until it finds a guideline range appropriate to the case.

USSG §4A1.3(a)(4)(B). However, the court need not "take a mechanistic approach to departures based on criminal history." *United States v. Gonzales-Ortega*, 346 F.3d 800, 803 (8th Cir. 2003) (citing *United States v. Leaf*, 306 F.3d 529, 533 (8th Cir. 2002)).

As indicated, Defendant's Offense Level before departures is **12** and he is a **Criminal History Category VI.** The court finds Defendant's criminal history warrants moving down the Sentencing Table **two levels** to **level 14**, **Criminal History Category VI**, **for an advisory guideline range of 37 to 46 months of imprisonment.**

### VII.  UPWARD DEPARTURE PURSUANT TO USSG §5K2.1 OR §5K2.21

The government seeks an upward departure to the statutory maximum of 240 months of imprisonment pursuant to USSG §5K2.1 (Death) or USSG §5K2.21 (Dismissed and Uncharged Conduct).  After setting forth the general law of Chapter 5 departures, the court examines each provision, in turn.

26

## A. General Principles

In discussing the propriety of Chapter 5 departures generally, the Eighth Circuit Court of Appeals recently summarized:

> Departures are appropriate if the sentencing court finds that there exists an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." USSG §5K2.0. The guidelines provide that sentencing courts [are] to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, a court may consider whether a departure is warranted. USSG §1A1.1, cmt. (n.4(b)).

*United States v. Chase*, 451 F.3d 474, 482 (8th Cir. 2006) (formatting altered). The decision whether to depart from the advisory Sentencing Guidelines rests within the sound discretion of the district court. *See, e.g., United States v. Thin Elk*, 321 F.3d 704, 707-08 (8th Cir. 2003) (reviewing for an abuse of discretion "because the decision to depart embodies the traditional exercise of discretion by the sentencing judge" (citations and internal quotation marks omitted)). However, "[b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases . . . ." *Koon v. United States*, 518 U.S. 81, 98 (1996). The district court must "carefully articulate the reasons for departure, particularly where the waters are unchartered." *United States v. Reinke*, 283 F.3d 918, 925-26 (8th Cir. 2002) (citing *Koon*, 518 U.S. at 95)).

"The district court is not left adrift . . . in determining which cases fall within and

27

which cases fall outside of the 'heartland.'" *United States v. McCart*, 377 F.3d 874, 877 (8th Cir. 2004) (citing *Koon*, 518 U.S. at 94). In USSG §5K2.1 *et seq.*, "[t]he Sentencing Commission enumerated some of the factors that it believed are not adequately accounted for in the formulation of the Guidelines and might merit consideration as aggravating or mitigating circumstances." *Thin Elk*, 321 F.3d at 708 (citing USSG §5K2.0). The enumerated factors that might merit consideration as aggravating circumstances are so-called "encouraged" factors. *See, e.g., McCart*, 377 F.3d at 877 (discussing "encouraged" and "discouraged" factors). "'If the [enumerated] factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account.'" *Id.* (quoting *Koon*, 518 U.S. at 96). Death, USSG §5K2.1, and Dismissed and Uncharged Conduct, USSG §5K2.21, are two "encouraged" factors.

The court finds that this case falls outside the "heartland." The court considers USSG §5K2.1 and USSG §5K2.21, in turn.

### B. USSG §*5K2.1*

The government seeks an upward departure pursuant to USSG §5K2.1. Section 5K2.1 provides:

> **§5K2.1. Death (Policy Statement)**
>
> If death resulted, the court may increase the sentence above the authorized guideline range.
>
> Loss of life does not automatically suggest a sentence at or near the statutory maximum. The sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation. Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken. The extent of the increase should depend on the dangerousness of the defendant's

28

conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidelines, already reflects the risk of personal injury. For example, a substantial increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of personal injury, such as fraud.

USSG §5K2.1 (emphasis in original).

Although resulting death does not mandate a sentence at or near the statutory maximum, *id.*, USSG §5K2.1 clearly "authorize[s] courts to 'increase the sentence above the authorized guideline range' up to the statutory maximum for the offense of conviction." *United States v. Howard*, 454 F.3d 700, 703 (7th Cir. 2006) (quoting USSG §5K2.1).[12] Every circuit court of appeals that has considered the issue has held that an upward departure under §5K2.1 may be based on harm resulting from relevant conduct, not just conduct comprising the offense of conviction. *United States v. Purchess*, 107 F.3d 1261, 1271 (7th Cir. 1997) (citing in part *United States v. Sanders*, 982 F.2d 4, 9-10 (1st Cir. 1992); *United States v. Shields*, 939 F.2d 780, 782-83 (9th Cir. 1991); and *United States v. Kim*, 896 F.2d 678, 683-84 (2d Cir. 1990)).

### 1. Applicability of departure

The court finds that an upward departure under §5K2.1 is appropriate. As the court's factual findings make clear, "death resulted" from Defendant's heroin distribution. USSG §5K2.1. By selling Butterbaugh heroin twice, Defendant knowingly risked Butterbaugh's death. *See United States v. Williams*, 51 F.3d 1004, 1012 (11th Cir. 1995)

---

[12] There are very few Eighth Circuit Court of Appeals cases that discuss or even mention §5K2.1 departures.

Case 1:06-cr-00040-LRR   Document 104   Filed 02/01/07   Page 29 of 40

("When determining whether a death 'resulted' from the offense for purposes of section 5K2.1, a factual finding 'that death was intentionally or knowingly risked is sufficient.'" (citing *United States v. White*, 979 F.2d 539, 545 (7th Cir. 1992) and *United States v. Rivalta*, 892 F.2d 223, 232 (2d Cir. 1989))), *abrogated on other grounds by Jones v. United States*, 526 U.S. 227, 231 (1999).

### 2. *Extent of departure*

In considering the extent of the departure, the court has considered all of the factors listed in §5K2.1. Some of the factors weigh against a sentence near the statutory maximum sentence of 240 months of imprisonment. For example, there is no evidence that Defendant intended, planned or prepared to kill Butterbaugh. Indeed, Defendant had every motive to keep Butterbaugh alive, so Defendant could sell Butterbaugh more heroin and score more "free highs." Multiple deaths did not result from Defendant's conduct. As a spate of the court's recent cases show, there is nothing extraordinary about the means by which Butterbaugh's life was taken. *See generally United States v. Bradford*, No. 05-CR-85-LRR, ___ F. Supp. 2d ___, 2006 WL 3253619 (N.D. Iowa Nov. 8, 2006) (detailing heroin sale resulting in death); *United States v. Ragland*, No. 06-CR-01-LRR, 2006 WL 2513026 (N.D. Iowa Aug. 28, 2006) (same); *United States v. L.M.*, 427 F. Supp. 2d 867 (N.D. Iowa 2006) (same).

Other factors weigh in favor of a departure at the upper end of the statutory range. Defendant's repeated sale of heroin to Butterbaugh on the date of his death was plainly reckless and extremely dangerous. *Cf. United States v. Merrival*, 176 F.3d 1079, 1081-82 (8th Cir. 1999) (characterizing speeding drunk driver as an "extremely dangerous" defendant that warranted a twelve-level upward departure pursuant to USSG §5K2.1 and USSG §5K2.2). Simply by selling heroin, Defendant knowingly risked that death or serious injury would result. Heroin is a dangerous controlled substance.

Although USSG §2D1.1 arguably takes into account some of the pernicious effects of heroin, it does not take into account death. USSG §2D1.1 contains a specific provision for death, USSG §2D1.1(a)(2), that was inapplicable here. If the offense of conviction establishes that death resulted from the use of the substance, the base offense level is **38**. USSG §2D1.1(a)(2). Such provision was inapplicable because the jury was inexplicably unable to find that Defendant's heroin distribution caused Butterbaugh's death beyond a reasonable doubt; death was not, therefore, established by the "offense of conviction." *Id.*; *see id.* §1B1.2(a) (defining offense of conviction as "the offense conduct charged in the count of the indictment . . . of which the defendant was convicted").

There is one especially aggravating factor here. Defendant knew that the heroin he sold Butterbaugh was especially pure and dangerous. Immediately following Defendant's second sale of heroin to Butterbaugh, Williams told Defendant, Butterbaugh and Peterson to "be careful" because the heroin was "pretty good stuff." Yet Defendant made no effort whatsoever to warn Butterbaugh himself or recall his product. *Cf. United States v. Ihegworo*, 959 F.2d 26, 29 (5th Cir. 1992) (affirming ten-level upward departure pursuant to USSG §5K2.1, where defendant knew he was distributing extraordinarily pure heroin and death resulted).

Based on all of the factors, the court finds that an upward departure to the middle of the statutory range is appropriate for Defendant. **Accordingly, the court shall depart upward ten levels pursuant to USSG §5K2.1 to level 24.** At **level 24 and Criminal History Category VI**, **Defendant's advisory Guidelines Sentence is 100 to 125 months of imprisonment.** Although the upward departure is greater than many this court has previously imposed, it is certainly not unprecedented. *See, e.g., Ihegworo,* 959 F.2d at 28 n.2 (noting that upward departure was for ten levels); *see also United States v. Lewis,* 235 F.3d 394, 396-97 (8th Cir. 2000) (affirming an "exceptional" upward departure of

31

fourteen levels that resulted in an increase in the defendant's sentencing range from 18 to 24 months of imprisonment to 87 to 108 months of imprisonment); *United States v. Reis*, 369 F.3d 143, 152 (2d Cir. 2004) ("[The Second Circuit Court of Appeals] has often affirmed upward departures that more than triple the upper-limit of the sentencing range." (Citations omitted.)); *cf. Merrival*, 176 F.3d at 1082 (affirming twelve-level upward departure pursuant to §5K2.1 and §5K2.2 where drunk driver killed two people and seriously injured three others).

### C. USSG §5K2.21

The government also seeks an upward departure pursuant to USSG §5K2.21. That section provides:

> **§5K2.21. Dismissed and Uncharged Conduct (Policy Statement)**
>
> The court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range.

USSG §5K2.21 (emphasis in original).[13]  Because the court has already departed upward pursuant to USSG §5K2.1 on account of Butterbaugh's death, it may not also depart upward pursuant to USSG §5K2.21.  *See United States v. Pena*, 339 F.3d 715, 719 (8th Cir. 2003) (explaining that the advisory Sentencing Guidelines generally prohibit "double counting," that is, when "one part of the Guidelines is applied to increase a defendant's

---

[13]  Section 5K2.21 became effective on November 1, 2000.  The amendment resolved a conflict in the circuit courts of appeal as to whether §5K2.0 permitted consideration of dismissed or uncharged conduct.  *United States v. Bolden*, 368 F.3d 1032, 1035 (8th Cir. 2004).

punishment on account of a kind of harm that has already been fully accounted for by application of another part of the guidelines" (citations and internal quotation marks omitted)).

## VIII.  VARIANCE

### A.  Sentence to be Imposed

Defendant's advisory Sentencing Guidelines range, after all applicable adjustments and departures, is 100 to 125 months of imprisonment.   In this post-*Booker* world, however, this sentence is merely advisory.  In other words, the departure issue is not the ultimate inquiry.

> Departures are based on specific sections of Chapter 5, Part K of the U.S. Sentencing Guidelines (USSG) Manual and USSG §4A1.3. Reasonableness of the ultimate sentence is based on the statutory elements contained in § 3553(a).   While the [issues of departures and variances] may sometimes overlap[,] . . . district courts . . . would do well not to make post-*Booker* sentencing any more confusing than necessary by conflating the two distinct analyses.

*United States v. Zeigler*,  463 F.3d 814, 820 (8th Cir. 2006) (Hansen, S.J., concurring) (citations omitted).

The court turns to examine the § 3553(a) factors.  In pertinent part, § 3553(a) directs the court to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and

33

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . issued by the Sentencing Commission . . . .
>
> (5) any pertinent policy statement . . . issued by the Sentencing Commission . . . .
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The court need not explicitly set forth its analysis of all of the § 3553(a) factors here. "Nothing in § 3553(a) or in the *Booker* remedy opinion requires 'robotic incantations' that each statutory factor has been considered." *United States v. Lamoreaux*, 422 F.3d 750, 756 (8th Cir. 2005) (quoting *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005)); *see also United States v. Gnavi*, No. 06-1659, 2007 WL 162731, at *5, ___ F.3d ___ (8th Cir. Jan. 24, 2007) (stating that a district court is not required to "'categorically rehearse'" all of the § 3553(a) factors, so long as it makes clear it considered all of them) (quoting *United States v. Dieken*, 432 F.3d 906, 909 (8th Cir. 2006)). The court's discussion of many of the factors militating in favor of a sentence near the middle of the statutory range of zero to 240 months of imprisonment are already set forth in the court's discussion of Defendant's advisory Sentencing Guidelines range, including the court's discussion of the appropriateness of upward departures. Put simply, this is not the typical heroin distribution case. Defendant personally distributed heroin resulting in the death of another human being. Butterbaugh's death was reasonably

34

foreseeable to Defendant; indeed, Defendant knew the heroin he sold Butterbaugh was especially pure and dangerous. Defendant has a lengthy and serious criminal history and poses a high risk to re-offend. Considering all of these factors, the court shall sentence Defendant within the advisory Sentencing Guidelines range, but at the high end of such range. The court shall sentence Defendant to 120 months of imprisonment.

### B. Alternative Sentences

In the event that the court is mistaken about the propriety or extent of its upward departures pursuant to USSG §4A1.3 and/or USSG §5K2.1, and Defendant's advisory Sentencing Guidelines range is less than 100 to 125 months of imprisonment, the court would nonetheless exercise its discretion under *Booker*, vary upward and impose a sentence of 120 months of imprisonment. A sentence below 120 months of imprisonment would not adequately reflect the seriousness of Defendant's offense, promote respect for the law or provide just punishment. A sentence below 120 months of imprisonment would also create unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. *See, e.g., United States v. Lazenby*, 439 F.3d 928, 933-34 (8th Cir. 2006). The court so finds after considering all of the § 3553(a) factors.[14]

### IX. UNDISCHARGED TERMS OF IMPRISONMENT

Defendant has two undischarged terms of imprisonment for his March of 2006 and

---

[14] The court would also impose the same sentence regardless of whether the advisory Sentencing Guidelines are entitled to a presumption of reasonableness or whether extraordinary circumstances must attend a sentence varying substantially from the advisory Sentencing Guidelines. *See Cunningham*, 2007 WL 135687, at *10 n.13, 549 U.S. at ___ n.13 (explaining that the Supreme Court has granted two petitions for certiorari this term, in order to resolve these two questions (referencing *Claiborne v. United States*, 127 S. Ct. 551 (2006) and *Rita v. United States*, 127 S. Ct. 551 (2006)).

35

February of 2006 Forgery convictions. PSIR at ¶¶ 44 and 48. Defendant is tentatively scheduled to be discharged from prison on both convictions on March 7, 2008.

USSG § 5G1.3 provides:

### § 5G1.3. Imposition of a Sentence on a Defendant Subject to an Undischarged Term of Imprisonment

(a) If the instant offense was committed while the defendant was serving a term of imprisonment (including work release, furlough, or escape status) or after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment.

(b) If subsection (a) does not apply, and a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct) and that was the basis for an increase in the offense level for the instant offense under Chapter Two (Offense Conduct) or Chapter Three (Adjustments), the sentence for the instant offense shall be imposed as follows:

> (1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and

> (2) the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment.

(c) (Policy Statement) In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term

36

> of imprisonment to achieve a reasonable punishment for the
> instant offense.

USSG §5G1.3 (emphasis in original). In the case at bar, Defendant did not commit the instant federal offense while serving a term of imprisonment. He also did not commit the instant federal offense between the time of sentencing on another offense and the time he was to commence a separate term of imprisonment. His 2006 Forgery convictions are unrelated to the instant offense. Therefore, subsection (c) applies. *Id.*; *see, e.g., United States v. Burch*, 406 F.3d 1027, 1030 (8th Cir. 2005) (reviewing district court's decision to impose consecutive sentences for clear error, because the district court's decision to apply USSG §5G1.3(b) or (c) "usually turns upon the extent to which the offenses in question are related, and such relatedness inquiries are necessarily fact-sensitive"). The court has the discretion to impose a concurrent, partially concurrent or consecutive sentence. USSG §5G1.3(c); *s.ee also* 18 U.S.C. § 3584(a) ("[I]f a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively.")

In deciding whether to impose a concurrent, partially concurrent or consecutive sentence under subsection (c), the court, in the interest of "achiev[ing] a reasonable incremental punishment for the instant offense and avoid[ing] unwarranted sentence disparity," considers the following factors:

> **(i)** The factors set forth in 18 U.S.C. § 3584 (referencing 18 U.S.C. § 3553(a));
>
> **(ii)** The type (e.g., determinate, indeterminate/parolable) and length of the prior undischarged sentence;
>
> **(iii)** The time served on the undischarged sentence and the time likely to be served before release;

> **(iv)** The fact that the prior undischarged sentence may have
> been imposed in state court rather than federal court, or at a
> different time before the same or different federal court; and
>
> **(v)** Any other circumstance relevant to the determination of an
> appropriate sentence for the instant offense.

USSG §5G1.3, cmt. (n.3) (emphasis in original). Considering these factors, including the factors at 18 U.S.C. § 3553(a), the court finds that the sentence for the instant federal offense should run consecutively to the undischarged terms of imprisonment for Defendant's March of 2006 and February of 2006 Forgery convictions.

## X. RESTITUTION

The USPO recommends that the court order Defendant to pay $3,340 in restitution to Barb Butterbaugh. PSIR at ¶ 17. The restitution would cover miscellaneous expenses associated with Butterbaugh's death, including funeral bills. *Id.*; *see* 18 U.S.C. § 3663A (providing mandatory restitution to victims of certain crimes). The government urges the court to adopt the USPO's recommendation.

Defendant objects to any order of restitution. He reasserts his claim that he is not responsible for Butterbaugh's death and points out that the jury was unable to find, beyond a reasonable doubt, that Butterbaugh died as a result of Defendant's heroin distribution. Defendant does not, however, object to the amount of the restitution, assuming such restitution is ordered.

The court orders Defendant to make restitution in the amount of $3,340 in restitution to Barb Butterbaugh. As the court's prior factual and legal findings make clear, Defendant is responsible for Butterbaugh's death. Defendant must, therefore, make restitution. *See, e.g., id.* § 3663A(b)(3) (requiring restitution for "funeral and related services" when a victim dies). Because Defendant is indigent, *see* PSIR ¶¶ 75-78, the

38

restitution is not due and payable immediately.  *Id.* § 3664(f)(2) (directing district court to consider the financial resources and projected earnings of the defendant in determining the manner and schedule in which restitution is to be made); *see United States v. Ruff*, 420 F.3d 772, 776-77 (8th Cir. 2005) (Loken, C.J., concurring) (explaining that restitution from indigent defendants is not due immediately).  The restitution obligation is due joint and several with Williams's restitution obligation.

## XI.  CONCLUSION

The court found that **Defendant's base offense level under the advisory Sentencing Guidelines was 12**.  USSG §2D1.1(a)(3) and (c)(14).  Defendant conceded that he was not entitled to a §3E1.1 acceptance-of-responsibility reduction.  Because Defendant was a **Criminal History Category VI**, the court found that, **before departures, Defendant's advisory Sentencing Guidelines range was 30 to 37 months of imprisonment.**  *See* USSG Sentencing Table.  The court found that Defendant's Criminal History Category VI substantially under-represented the seriousness of Defendant's criminal history and the likelihood that he will commit other crimes.  Accordingly, the court departed upward two levels pursuant to USSG §4A1.3 to a level **14**.  The court then found Defendant's case to be outside the "heartland" and decided to depart upward an additional ten levels to level **24** pursuant to USSG §5K2.1.  Defendant's advisory Sentencing Guidelines range, after all departures, was 100 to 125 months of imprisonment. The court decided a variance from the advisory Sentencing Guidelines range was not appropriate, and, **after analyzing the factors at 18 U.S.C. § 3553(a), decided that a sentence of 120 months of imprisonment was a reasonable sentence**.  The court ordered the sentence to run consecutively to the undischarged terms of imprisonment in Linn County, Iowa, Case No. FECR 62866-0805 and Benton County, Iowa, Case No. FECR 9757.  The court ordered Defendant to make restitution in the amount of $3,340 to Barb

Butterbaugh. The restitution obligation is due joint and several with the restitution obligation imposed in *United States v. Shaun Williams*, Case No. 06-CR-40-1-LRR.

**IT IS SO ORDERED.**

**DATED** this 1st day of February, 2007.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA